**Paul SWIDER, Plaintiff,**

v.

**HA–LO INDUSTRIES, INC., Defendant.**

**No. Civ.A. 99–1964.**

United States District Court, D. New Jersey.

March 9, 2001.

As Amended March 20, 2001.

Kevin M. Kiernan, Loretta A. Castrovinci, McDonough, Kiernan & Campbell, Montclair, NJ, for plaintiff.

William R. Horwitz, Sills Cummis Radin Tischman Epstein & Gross, Newark, NJ, Alisa B. Arnoff, Scalambrino & Arnoff, Chicago, IL, for defendant.

## OPINION

WOLIN, District Judge.

Now before the Court is defendant's motion for summary judgment in this employment action. Plaintiff, Paul Swider, a former employee of defendant, HA–LO Industries, Inc. ("HA–LO"), brings this action for breach of contract, promissory estoppel, discriminatory discharge in violation of the New Jersey Law Against Discrimination ("LAD") and fraud. Defendant has moved for summary judgment on all counts of the Complaint.

The Court has considered the submissions of the parties and decided this motion on the papers pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons discussed below, the Court will grant defendant's motion. Plaintiff's Complaint will be dismissed in its entirety, with prejudice.

## BACKGROUND

### 1. Mergers and Acquisitions

In 1997, defendant, a Chicago-based company, acquired NB Specialties, Inc. ("NB"), a Montville, New Jersey-based company that distributed promotional products, such as merchandise bearing a company's name or logo. Defendant was in the same industry as NB. After the acquisition, defendant maintained the Montville office, and employed Caryl and Neil Breithaupt, the former owners of NB. Caryl was hired as the office manager for New Jersey and Neil was hired as Sales Manager, also in New Jersey. Both Breithaupts were given written employment contracts specifying that they would hold those particular positions for five years and that they could only be dismissed for cause.

During this same period, plaintiff was working for Red Sail Merchandising ("Red Sail"), a San Francisco-based company. Plaintiff worked in their Hillside, New Jersey office as regional sales director. Sometime in 1997, plaintiff learned that Red Sail was to be sold to defendant. Herb Levy, Vice President—Northeast for defendant, contacted plaintiff to express defendant's interest in keeping him on after the acquisition. Plaintiff was told that defendant needed his experience to help in developing the New Jersey office. Plaintiff and Levy met several times to discuss plaintiff's employment with defendant. Plaintiff also met with Greg Kilrea, defendant's CFO, for the same purpose.

Defendant offered plaintiff a position as Sales Manager for New Jersey, but did not inform plaintiff of what his specific duties would be. Plaintiff was told that it was not defendant's practice to enter into written contracts with management-level employees.[1] At the time of his hiring, plaintiff did not know that Neil Breithaupt was also employed as Sales Manager for New Jersey or that Neil Breithaupt had a written employment contract.

---

1. Plaintiff did have a contract with Red Sail, which covered him through the end of January 1998. It was agreed, when plaintiff was hired by defendant, that his compensation would be reviewed when that contract expired. Plaintiff's compensation was reviewed by Greg Kilrea in February 1998 and plaintiff received a small raise.

Plaintiff was told that defendant's sales managers were typically expected to make sales, but that he would not be responsible for any sales himself. Swider Dep. 32:11–23.[2] Plaintiff was further told by defendant's Chief Operating Officer, Richard Magid, to disregard the comments of a fellow Red Sail employee, Ann Nepo, suggesting that plaintiff would not be Sales Manager after the acquisition. Magid told plaintiff not to worry about Nepo and assured him that defendant did want to hire him. Magid further told plaintiff that he knew the kind of individual Nepo was and that she had previously caused trouble at Red Sail. He suggested that if Nepo became a serious problem, her termination was a possibility. Swider Dep. 101:18–104:12.

Notwithstanding the offer from defendant, plaintiff did make a limited inquiry regarding other possible employment. Plaintiff's efforts in that regard were, however, relatively few and unfocused. He did not send out his resume or take any action beyond "networking and talking to people." He had no actual interviews. Swider Dep. 35:3–36:3. Tom McNulty, a friend of plaintiff and then-client of Red Sail, invited plaintiff to come work for him "anytime [he] wanted." Plaintiff and McNulty had a number of conversations about plaintiff's joining McNulty's company, one of which occurred before plaintiff had even spoken to Levy about working for defendant. These conversations occurred at McNulty's offices when plaintiff was there on Red Sail business or visiting socially. Swider Dep. 36:7–39:11.

McNulty wanted plaintiff to work as a commissioned salesperson for Distro–Sales, a company owned by Green, Lind & McNulty, McNulty's advertising firm. At the time, Distro–Sales had no employees

other than Green, Lind & McNulty employees who ran it and Distro–Sales had never employed a salesperson before plaintiff was offered the job. McNulty did not give plaintiff an offer in writing and they did not discuss the job in specific terms because plaintiff indicated that he was not interested. Plaintiff did not want to work strictly on a commission basis and, therefore, was not interested in working for Distro–Sales. Plaintiff obviously preferred working for defendant, who promised him that, notwithstanding his title as Sales Manager, he would not have to make any sales of his own. In fact, McNulty's deposition testimony suggests that plaintiff would not have gone to work for Distro–Sales, even if he had not had an offer from defendant. *See* McNulty Dep. 40:1–6 ("[Plaintiff] wanted a position which was more of a management kind of a position and a position that had, as he indicated to me, a steadier income.").

Plaintiff never told anyone at defendant-company that he had turned down a job offer from McNulty, Lind & Green. Plaintiff accepted defendant's offer of employment and, on October 20, 1997, he began working for defendant in their Hillside office at a higher salary than he had been earning at Red Sail. As noted above, Neil Breithaupt had already been hired as Sales Manager as well, so plaintiff and Breithaupt were co-sales managers for New Jersey, with plaintiff operating out of the Hillside office and Breithaupt based in Montville. Apparently, it was understood by all parties that, notwithstanding their titles, plaintiff was in fact Neil's superior, and that plaintiff had, in plaintiff's own words, "direct responsibility, overall responsibility for all operations and sales and

---

**2.** Citations to Paul Swider's 1999 deposition will be noted as Swider Dep. Page:Line. Citations to his 2000 deposition will be noted as

Swider Dep. II Page:Line. Citations to other deposition testimony will be made in the same form as citations to Swider's 1999 deposition.

Neil was—Neil's responsibility was for his own sales." Swider Dep. 49:19–24.

Approximately three months after defendant acquired Red Sail, in or about January 1998, defendant merged its Montville and Hillside offices into a single, new office space in Florham Park, New Jersey. Plaintiff had primary responsibility for the design and layout of that space. He worked with the architects and Sabina Filipovic, from defendant's Chicago office. Plaintiff states that he involved Neil Breithaupt in "all the decisions," but that plaintiff maintained ultimate decision-making authority. Plaintiff remembers several occasions on which he overrode Neil's suggestions, but contends that on the whole, they sought to achieve consensus through compromise. Swider Dep. 53:20–54:18.

Following the merger of the two offices, plaintiff continued to have overall responsibility for operations and ultimate decision-making authority. Neil Breithaupt, though still Sales Manager in name, assisted plaintiff with operations and made sales of his own. Plaintiff's understanding, gleaned from conversations with Herb Levy and Greg Kilrea, was that Neil was "to grow his sales," which was essentially what salespersons at defendant-company did, rather than what managers did. Swider 57:5–58:7. After the merger of the offices, Caryl Breithaupt was Neil's assistant.

## 2. Problems in the New Jersey Office

Shortly after the merger of the Montville and Hillside offices, problems developed in defendant's New Jersey office. The problems seem to have derived both from tensions created by the corporate organization and from the clash of personalities of the individuals working together in the newly merged office.

Plaintiff acknowledges that the office was not running smoothly, but he faults the Breithaupts and Anne Nepo for this situation. According to plaintiff, the problems were caused by (1) Caryl Breithaupt's "controlling behavior" and constant "interference" in the operations of the office, and (2) both Breithaupts' extreme unhappiness resulting from the "bad deal" they made with defendant. Plaintiff contends that the Breithaupts felt betrayed by defendant in that they believed that Neil was to be Sales Manager and Caryl was to be Office Manager, but neither ultimately was. Moreover, both of their contracts contained non-compete clauses that prevented them from taking any customers with them should they decide to leave defendant, and both had received stock options, which were proving unprofitable. Plaintiff apparently received complaints from a number of employees about Caryl Breithaupt. Swider Dep. 65:9–67:8; 73:4–74:13.

Plaintiff also blames personnel problems and low morale on the "animosity" Anne Nepo felt towards him. Plaintiff knew what Nepo thought of him from the beginning. Even before he became Sales Manager, she had been spreading rumors about him. Then, when he was manager, Nepo complained to Mike Stoll, Manager of defendant's White Plains office, about plaintiff. Nepo indicated that she did not respect plaintiff, that he was not helping her or managing her at all. Stoll told plaintiff about this conversation with Anne and told him "that he had to give this a chance ... working with her and trying to manage and assist her and show that he could be effective ..." Stoll Dep. 15:22–25. Stoll informed others in higher management about the situation between plaintiff and Nepo.

There were other complaints about plaintiff and concerns on the part of management about plaintiff's performance as well. Management felt that plaintiff was being paid an excessively high salary for a

manager who was not making sales. Moreover, management felt that plaintiff was not driving profits sufficiently and that the New Jersey office was not meeting its performance expectations. According to Rich Magid, on more than one occasion in late 1997 and early 1998, he and plaintiff discussed changing plaintiff's job description to require him to make sales of his own. Plaintiff was not interested and refused to accommodate such a change. Magid Dep. 51:9–53:6. Greg Kilrea also testified that Neil Breithaupt complained to him more than once about plaintiff. Apparently, Neil informed Kilrea that "the office [was] disorganized, that [plaintiff] was not effectively managing either the sales force or the administrative staff, that he was negatively affecting morale, that the sales reps from Red Sail, the old Red Sail, were going around [plaintiff] and going to Neil as a sales management resource because they weren't comfortable with [plaintiff's] sales management ability." Kilrea Dep. 37:2–23. Kilrea transmitted complaints made to him to Magid so that Magid was aware of the situation. Kilrea Dep. 39:21–23. Therefore, upper management was hearing complaints about plaintiff from both Stoll and Kilrea.

### 3. The Bernal/Nepo Letter

On May 5, 1998, Tanja Bernal, a member of the support staff, sent a letter to Sabina Filipovic, the head of human resources at corporate headquarters in Illinois, complaining about plaintiff. *See* Kiernan Certif., Exh. Q. The letter discussed problems that Bernal perceived in the New Jersey office, particularly regarding plaintiff's management. Specifically, it noted that morale was low and attributed that to plaintiff, whom Bernal indicated was "a very ineffective manager." Kiernan Certif., Exh. Q, at 1. The letter suggested that plaintiff was not working hard at his job and was not responsive to the concerns or needs of his staff. *Id.* at 2. It

further blamed plaintiff for problems that the staff was having with Barbara King, the Operations Manager whom plaintiff had hired. *Id.*

When Filipovic received this letter, she spoke immediately to Rich Magid and Gene Ehrenfeldt. She shared the letter's contents and asked how they wanted her to handle it. It was agreed that Magid and Ehrenfeldt would deal with it because they interacted more with plaintiff. Filipovic Dep. 26:10–27:6. Filipovic also spoke to Neil Breithaupt because she wanted to ascertain his perspective on the situation, given that he and plaintiff were co-managers at that time. Filipovic Dep. 28:18–29:5; 31:7–24. Therefore, the letter's existence and contents were widely known among upper management.

Filipovic also spoke to Anne Nepo, whom she knew was involved in the drafting of the letter in some way. She informed Nepo that her behavior—discussing her problems with a particular manager with another employee—was unprofessional and inappropriate and could lead to her termination. Filipovic Dep. 34:2–22.

Plaintiff learned of the letter from Sabina Filipovic, but did not learn who had written it or exactly what it said. She informed him only that they had received a letter complaining about him and, as a result, she was overseeing his decisions more carefully. Swider Dep. 89:2–90:2. Plaintiff approached Neil Breithaupt about the letter. Neil acknowledged his awareness of the letter's existence and provided plaintiff with a copy of the letter that he had received several weeks before. Swider Dep. 90:7–18. Plaintiff subsequently learned from another employee that many employees had known of the letter before it was signed by Bernal and delivered to management. According to plaintiff, this other employee indicated that pressure

had been put on others in the office to sign a letter complaining about plaintiff. Swider Dep. 93:20–94:8.

Within only a few weeks of the letter's transmission to Filipovic, plaintiff received a phone call from Bernal, the letter's author. She called to apologize about the letter and to inform plaintiff that she had not in fact written it, but rather that Anne Nepo had. Anne Nepo had apparently pressured Bernal into signing and sending the letter. Bernal later sent a retraction letter to plaintiff. *See* Kiernan Certif., Exh. S. In the retraction, Bernal again apologized for the letter's contents and explained that she sent it to put an end to Nepo's harassing behavior towards her, which included phone calls to Bernal's home. *Id.*

### 4. Restructuring and Termination

In late May or early June 1998, it became apparent that the co-manager structure was failing and had to be eliminated. Magid solicited thoughts of others in upper management on restructuring and on the possibility of elevating plaintiff to the status of sole manager. Kilrea agreed with Magid that some corporate reorganization was necessary. Kilrea Dep. 40:17–41:16. Filipovic, for her part, believed that the co-manager arrangement was not working, but she was not sure that plaintiff was capable of managing the sales department on his own. She felt that "Paul wasn't going to be strong enough for that location in a sales manager role due to the fact that he didn't necessarily have sales experience." Filipovic Dep. 44:3–9. She shared these thoughts with Rich Magid and Gene Ehrenfeldt. Filipovic Dep. 44:10–15. Ultimately, the decision was made to dispense with the co-manager structure and to make plaintiff Sales Manager and change Neil Breithaupt to salesperson.

According to plaintiff, at approximately that time, he received a phone call from Lou Weisbach, defendant's CEO and President, telling him how pleased the company was with him and that he was getting "very good reports" about plaintiff. Swider Dep. 111:9–18.

Notwithstanding this alleged positive feedback, not long after the restructuring, Magid decided to fire plaintiff. Magid did not make this decision alone. About one month before plaintiff's termination, Mike Stoll had spoken to different members of upper management about the tension between plaintiff and Nepo. He indicated that the situation "had gotten to a point where [he] didn't feel it could be resolved ..., unless [the company] made a significant change, and ... that [the] best solution at this point [was] to let Paul go." Stoll Dep. 20:17–23. Stoll recommended this because he believed that they would "be able to move the office ahead faster and more effectively by replacing Paul." Stoll Dep. 23:7–11.

Gene Ehrenfeldt, Sabina Filipovic and Greg Kilrea also participated in Magid's decision to terminate plaintiff. Ehrenfeldt Dep. 43:3–10. They met to discuss the continuing problems in the New Jersey office and how to handle them. They discussed the feedback that had been coming from different individuals in the New Jersey office regarding its functioning and morale. They agreed that the office was not running efficiently and that sales were not meeting the expectations of management. Kilrea Dep. 48:10–24. The ultimate decision was to terminate plaintiff. Ehrenfeldt Dep. 43:3–10.

On or about July 19, 1998, Gene Ehrenfeldt, Vice President of Sales, met with plaintiff and informed him that the company no longer needed his services. When plaintiff asked Ehrenfeldt the reasons for his termination, Ehrenfeldt told him simply that the company "wanted to make changes." Swider 114:14–25. Ehrenfeldt

also volunteered that the decision to fire him had nothing to do with the Bernal/Nepo letter.

At the time of plaintiff's discharge, the position that McNulty had offered to plaintiff may have remained open, but plaintiff contends that he was not made another offer to accept the position.

## DISCUSSION

### 1. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

A district court may not resolve factual disputes in deciding a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.*, 49 F.3d 915, 926–27 (3d Cir.1995) ("[A]t the summary judgment stage, the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (quotations and citation omitted); *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("[T]hreshold inquiry is whether there are genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.") (quotations and citations omitted).

When considering a motion for summary judgment, all evidence submitted must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As Rule 56(c) makes clear, once the mov-

ing party submits a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. *See* Rule 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). to make that showing, the non-moving "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party, therefore, must come forward with "specific facts showing that there is a triable issue." Fed.R.Civ.P. 56(e). "[T]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Moreover, if "the evidence [submitted by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505. And, unsupported allegations in a memorandum and pleadings are insufficient to repel summary judgment. *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir.1990). Moreover, when the factual context renders a claim implausible, the nonmovant has a heavier burden of production in opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see also Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993).

Thus, "[s]ummary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).

A review of all the submissions in this case reveals no genuine factual dispute that can be described as "material" in light of the controlling authority. Therefore, summary judgment is appropriate.

### 2. Breach of Contract and Promissory Estoppel

Plaintiff makes two claims sounding in contract, one for breach of contract and the other for relief on a theory of promissory estoppel. The Court will address each individually.

#### a. Breach of Contract .

■ As a general rule under the employment-at-will doctrine, an employer may fire an employee for good cause, bad cause or no cause at all. *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397, 643 A.2d 546 (1994). However, the New Jersey Supreme Court has carved out certain limited exceptions to that general rule. In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the court held that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy and in *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985), the court held that, absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even though the employment is for an indefinite term and is otherwise terminable at will.

■ Finally, and of particular relevance here, in *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 544 A.2d 377 (1988), the court held that oral assurances of job security may be enforceable by an employee where the terms and conditions of employment are clear and capable of judicial interpretation and an employee reasonably relies on them to his/her detriment. Such an oral

contract may be enforceable if the intention of the parties to make such a contract is clearly, specifically and definitely expressed, and the intent of the parties may be ascertained from the oral agreement, the attendant circumstances and the presence of valuable consideration. *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 953 (D.N.J.1993).

Plaintiff contends that, under *Shebar*, his employment-at-will relationship with defendant was converted to one that could be terminated for cause only, or at least that could not be terminated on the basis of comments by Anne Nepo. Plaintiff alleges that his termination was wrongful in that it was without cause and influenced by Ms. Nepo's comments. Plaintiff contends that the facts at bar are analogous to those in *Shebar*, but, a comparison of the facts of the two cases showcases the weakness of plaintiff's claim of breach of contract.

*Shebar* tendered his resignation from Sanyo with the intention of taking a job at Sony Corporation. After submitting his resignation, Shebar was called into his supervisor's office and told that his resignation would not be accepted, that Sanyo had never fired management-level employees and did not intend ever to do so, that Shebar had a job for life and that Sanyo would do anything to resolve his problems. In reliance on those representations, Shebar turned down the job with Sony and remained at Sanyo. In congratulating Shebar on his decision to stay with Sanyo, his supervisor said he had made a wise decision and assured him that he was "married" to Sanyo and divorce was unthinkable. Four months later, however, Shebar was fired.

Shebar sued contending that defendant made unique, oral promises of lifetime employment specifically to him that he relied upon in revoking his acceptance with Sony. The New Jersey Supreme Court held that

Shebar made out a case of breach of contract sufficient to survive summary judgment. Shebar's circumstances, according to the court, created a "special contract with a particular employee," as opposed to a general employer policy covering all employees, as in *Woolley,* and that the special contract with Shebar guaranteed that his employment could be terminated for cause only.

The court, moreover, held that "a factfinder could conclude that plaintiff gave valuable consideration for Sanyo's promise of continued employment with termination only for cause." *Shebar,* 111 N.J. at 289, 544 A.2d 377. The consideration noted by the court was plaintiff's relinquishment of his new position at Sony. The court found that Shebar's rejection of that job offer was made *in exchange for* job security at Sanyo and that Sanyo, in turn, agreed to relinquish its right to terminate plaintiff's employment-at-will *in exchange for* the retention of a valued employee. According to the court, "[s]uch bargained-for and exchanged promises furnish ample consideration for an enforceable contract." *Id.* at 289, 544 A.2d 377.

In so holding, however, the court cautioned that "not every relinquishment of a prior job or job offer constitutes additional compensation to support the modification of an at-will employment into employment with termination for cause only." *Id.* at 289–90, 544 A.2d 377. To the contrary, as the court subsequently made clear in *Bernard v. IMI Sys., Inc.,* 131 N.J. 91, 96, 618 A.2d 338 (1993), "in the absence of a contrary agreement, an employee is hired at-will ..." and "both employers and employees commonly and reasonably expect employment to be at-will, unless specifically stated [otherwise] in explicit, contractual terms." *Id.* at 106, 618 A.2d 338.

Plaintiff's case now before the Court cannot meet the standard established by *Shebar.* To have a cause of action for breach of contract under *Shebar,* a plaintiff must demonstrate the existence of: (1) a contract sufficiently clear and capable of judicial interpretation that is not vague or indefinite; and (2) adequate consideration. Plaintiff cannot point to sufficient evidence here of either a contract or consideration.

In order to be enforceable, the terms of any contract—oral or written—must be sufficiently clear and capable of judicial interpretation. *Fregara v. Jet Aviation Bus. Jets,* 764 F.Supp. 940, 946 (D.N.J.1991). Therefore, the threshold question for the Court in determining whether plaintiff's alleged oral contract is enforceable is whether the alleged agreement was "clearly, specifically and definitely expressed." *Savarese v. Pyrene Mfg. Co.,* 9 N.J. 595, 600–601, 89 A.2d 237 (1952); *see also Shiddell v. Electro Rust-Proofing Corp.,* 34 N.J.Super. 278, 289, 112 A.2d 290 (App.Div.1954). The Court finds no clear, specific and definitely expressed agreement here between the parties regarding plaintiff's employment and his job security. Plaintiff has offered no evidence of representations by defendant regarding the terms and conditions of his employment, save for the assurances that Nepo's comments would not affect defendant's decision to hire plaintiff. Plaintiff even concedes that defendant told him that it did not enter into written employment contracts with employees at the management-level and that he and defendant never discussed his job description in any specifics. Swider Dep. 31:18–32:10; 41:15–21; 46:8–10. Therefore, the Court finds no contract for employment with termination for cause only.[3]

---

3. In his breach of contract claim, plaintiff argues that he could not be terminated at will, or in the alternative, that he had a contractual agreement with defendant that defendant could not terminate him on the basis of Nepo's comments. The Court addresses the

■ Moreover, even if plaintiff could establish that there was an oral employment agreement with precise terms and conditions, including a promise of job security, his alleged oral contract and breach of contract claim would fail for lack of consideration. As noted in *Shebar*, the essential requirement of consideration is a bargained-for exchange of promises or performance. *Id.* at 289, 544 A.2d 377 (citing Restatement (Second) of Contracts § 71 (1981)). There is no evidence of a bargained-for exchange in the case now before the Court. While plaintiff may have opted not to accept employment at Distro–Sales, mere offers of employment that are declined are insufficient to satisfy the requirement of consideration. Plaintiff must establish that defendant's promises were made to induce him to decline those other job offers and that he did decline those other offers and accept defendant's in reliance on defendant's representations. *Maietta v. United Parcel Service, Inc.*, 749 F.Supp. 1344, 1365 (D.N.J.1990). Here, plaintiff cannot make that showing because defendant was unaware of his offer from McNulty, so, defendant's assurances could not have been intended to induce plaintiff to turn down that offer.

Plaintiff's breach of contract claim cannot survive summary judgement because plaintiff can establish neither specific terms and conditions of his alleged oral contract nor the consideration supporting that alleged contract.

### b. Promissory Estoppel

Plaintiff also argues that he is entitled to relief on a theory of promissory estoppel. He asserts that he detrimentally relied on defendant's offer of employment by turning down the job offer from McNulty.

■ To recover on a theory of promissory estoppel, plaintiff must prove that (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) incurred a detriment in said reliance. *Peck v. Imedia, Inc.*, 293 N.J.Super. 151, 165, 679 A.2d 745 (App. Div.1996) (quotations and citations omitted). In *Peck*, the Appellate Division noted that courts have generally found that the mere detriment furnished by an employee in leaving one position and taking another does not constitute sufficient consideration to create a contract of permanent employment or one terminable for cause only. *Id.* (citing Annotation, *Employer's State–Law Liability for Withdrawing, or Substantially Altering, Job*

---

first contention at length in the body above, but makes only passing note of the second. First, the Court finds no evidence in the record of a promise by defendant that plaintiff could not be terminated on the basis of Nepo's comments. Rich Magid told plaintiff that Nepo's statements would not affect their decision to hire him. He made no promises regarding plaintiff's eventual firing. Moreover, even if defendant had made a promise that plaintiff would not be fired on the basis of another employee's comments about him, such a promise is unenforceable. An at-will employee, as noted above, may be fired for good cause, bad cause or no cause at all. *See e.g., Bruffett v. Warner Communications, Inc.*, 692 F.2d 910, 913 (3d Cir.1982) ("Although contract terms can be implied, the employ-

ment contract itself cannot; either the employee works at-will or has an express employment contract with a term establishing a definite and specific length of employment."); *Bishop v. Seaway Elec. Supply, Inc.*, 1986 WL 55323, at *2–*3 (Pa.Ct. Common Pleas 1986) ("An at-will employee's contractual terms may be modified by the employer at his or her whim."). Finally, even if plaintiff could establish that defendant had promised not to fire him on the basis of Nepo's comments, there is no evidence in the record to suggest that her statements were the basis for plaintiff's termination. In fact, Ehrenfeldt specifically told plaintiff that the Bernal/Nepo letter did not influence management's decision to discharge plaintiff.

*Offer for Indefinite Period Before Employee Actually Commences Employment,* 1 A.L.R.5th 401 (1992)). Because promises of employment are generally promises of at-will employment only, reliance thereon does not typically give rise to a cause of action. *Peck,* 293 N.J.Super. at 166, 679 A.2d 745 (collecting cases).

However, the *Peck* court noted that there may be losses incident to reliance upon the job offer itself that will support a claim for promissory estoppel, regardless of the fact that the employer can terminate the relationship at any time. The plaintiff in *Peck,* for example, suffered obvious detriment in her reliance on defendant's promise of full-time employment. She rented out her apartment in Boston and signed a new lease for an apartment in New Jersey, arranged for movers and, perhaps most importantly, gave up her clients in the Boston-area. *Id.* at 158, 679 A.2d 745. On those facts, the Appellate Division found that Peck's promissory estoppel claim should have survived summary judgment.

Other courts have allowed plaintiffs to present claims of promissory estoppel to a jury or awarded damages on a theory of promissory estoppel where the plaintiff suffered some clear detriment in reliance on a defendant's promises. For example, where a plaintiff terminates one lease and incurs expenses in relocating to commence a contract with defendant, which defendant later terminates, plaintiff may have a claim for promissory estoppel. *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.,* 307 N.J.Super. 461, 472–73, 704 A.2d 1321 (App.Div.1998). Similarly, a plaintiff who purchased property for lease to a defendant on the defendant's representation that the parties had "a deal" made out a claim for promissory estoppel adequate to survive summary judgment. *Mahoney v. Delaware McDonald's Corp.,* 770 F.2d 123, 127 (8th Cir.1985). And, where plaintiff

terminated an existing lease on defendant's representation that a new lease with defendant was a "done deal," plaintiff made out a case for promissory estoppel. *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.,* 818 F.Supp. 1152, 1161 (N.D.Ill.1993).

█ In each of these cases, however, including *Peck,* the plaintiff incurred some external, additional cost in reliance on the defendant's representations, which cost could be recovered on a theory of promissory estoppel. Here, plaintiff fails to allege such detrimental reliance. Plaintiff alleges that he passed up another job offer in reliance on defendant's alleged oral promises. Plaintiff's alleged detrimental reliance is inadequate, however, because plaintiff did not make defendant aware of the offer from McNulty or his decision to turn it down in favor of his position with defendant. *See Moore v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 1991 WL 149881, at *7 (D.N.J.1991) (holding that plaintiff's claim failed for lack of evidence of a bargained-for exchange and reliance where plaintiff never informed defendant that she was considering another job offer or that she turned down that offer).

Plaintiff, here, has not established that he suffered any detriment beyond that suffered by every at-will employee upon termination. Therefore, plaintiff's promissory estoppel claim, like his breach of contract claim, fails.

### 3. New Jersey Law Against Discrimination

#### a. Legal Framework

The second count of plaintiff's Complaint alleges unlawful age discrimination in violation of the New Jersey Law Against Discrimination ("LAD"). The LAD provides in pertinent part:

It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:

a. For an employer, because of the ... age, ... of any individual, ... to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment ...

N.J.S.A. 10:5–12(a).

The New Jersey courts have interpreted the proofs and burdens of persuasion for discrimination under the LAD in the same manner as that under the federal anti-discrimination laws. *See Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 550, 569 A.2d 793 (1990); *Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 595, 538 A.2d 794 (1988). Thus, the Court will consider both federal and New Jersey cases in evaluating plaintiff's claim of age discrimination.

 In order to establish an LAD cause of action, plaintiff must "show that the prohibited consideration [age] played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Maiorino v. Schering–Plough Corp.,* 302 N.J.Super. 323, 344, 695 A.2d 353 (App.Div.), *certif. denied,* 152 N.J. 189 (1997) (citations and quotation omitted). Proving discrimination is a three-step process derived from the *McDonnell Douglas* framework, as modified by the New Jersey courts, for age-based discharge claims.

 First, plaintiff carries the burden of establishing, by a preponderance of the evidence, the elements of a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To make out a *prima face* case of age discrimination under the LAD, a plaintiff must show: (1) that he is a member of a class protected by the anti-discrimination law; (2) that he was performing his job at a level that met his employer's legitimate expectations; (3) that he was discharged; and (4) that he was replaced by someone sufficiently younger to give rise to an inference of unlawful age discrimination. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 (3d Cir.1988) *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Fischer v. Allied Signal Corp.,* 974 F.Supp. 797, 805 (D.N.J.1997). Plaintiff's burden in establishing a *prima facie* case is not onerous and the *prima facie* case is generally easily made out. *See Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Murray v. Newark Housing Auth.,* 311 N.J.Super. 163, 172, 709 A.2d 340 (Law Div.1998). However, the minimum requirement is the establishment of an inference of unlawful discrimination. *Fischer,* 974 F.Supp. at 805 ("[T]he United States Supreme Court has emphasized that the core of a *prima facie* case of discrimination is evidence adequate to create an inference that an employment decision was based upon an illegal criterion, such as age.").

 Once the employee has established a *prima facie* case, a presumption is created that the employer unlawfully discriminated against him. *Stewart v. Rutgers, the State Univ.,* 120 F.3d 426, 432 (3d Cir.1997). The burden then shifts to the employer to rebut the presumption of discrimination in one of two ways. Defendant may either show the reasonableness of the otherwise discriminatory act, or articulate a legitimate, non-discriminatory reason or reasons for the employment action. *Maiorino,* 302 N.J.Super. at 345–47, 695 A.2d 353. "To accomplish this, the

defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action." *Stewart*, 120 F.3d at 432 (citations and quotation omitted). The employer only carries the burden of production, rather than persuasion, of showing a legitimate, non-discriminatory reason for its action. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089.

■■■ Once the employer sets forth a legitimate, non-discriminatory reason for its employment action, the burden again shifts to the employee to show that the employer's articulated reason was merely a pretext to mask the discrimination or that it was not the true motivating reason for the employer's action. *Kelly v. Bally's Grand, Inc.*, 285 N.J.Super. 422, 430, 667 A.2d 355 (App.Div.1995). An employee successfully meets this burden by "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

**b. Application**

As noted above and discussed herein, the core of a *prima facie* case of age discrimination under federal and state anti-discrimination laws is evidence adequate to create an inference of unlawful age discrimination. *See Teamsters v. U.S.*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Because the facts of this case do not give rise to such an inference, the Court concludes that plaintiff has failed to establish the requisite *prima facie* case. Moreover, as discussed below, the Court finds that, even if plaintiff could

have made out a *prima facie* case of age discrimination, defendant had legitimate, non-discriminatory reasons for discharging plaintiff, which reasons plaintiff cannot prove were pretextual.

**i. *Prima Facie* Case**

■■■ Plaintiff was forty-nine at the time of his discharge. As such, he was a member of a protected class and, therefore, satisfies the first prong of the four-part *prima facie* case. *See Silvestre v. Bell Atlantic Corp.*, 973 F.Supp. 475, 482 (D.N.J.1997) (plaintiff of forty-seven years of age was member of protected class); *Greenberg v. Camden County Vocational and Technical Schs.*, 310 N.J.Super. 189, 201, 708 A.2d 460 (App.Div.1998) (at age forty-eight plaintiff was member of protected class); *Geldreich v. Am. Cyanamid Co.*, 299 N.J.Super. 478, 489, 691 A.2d 423 (App.Div.1997) (plaintiff was "in a protected class at age fifty-four").

To satisfy the second prong, plaintiff must show that he was performing his job satisfactorily. The parties disagree whether plaintiff has made an adequate showing of satisfactory performance.

Defendant contends that plaintiff has not made an adequate showing. In support of its position, defendant points to cases that establish that plaintiff's subjective perception of his own performance is insufficient to create an issue of fact adequate to survive summary judgment. *See, e.g., Silvestre v. Bell Atl. Corp.*, 973 F.Supp. 475, 483 (D.N.J.1997). Defendant contends that plaintiff has not offered any evidence beyond his conclusory statements regarding the adequacy of his performance.

Plaintiff, for his part, notes that caselaw has established that, because the burden of making out a *prima facie* case is not supposed to be onerous, plaintiff need only satisfy an objective standard. He need

only show that he had the education and experience necessary to qualify for the position he held. Subjective consider-ations, such as leadership ability and man-agement skills, are to be considered when determining whether the employer's as-serted non-discriminatory reason for the termination was pretext. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 726 (3d Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

 The Court agrees with plaintiff that his burden is not intended to be oner-ous at this stage and that objective qualifi-cations for the position in question should suffice. Given that, the Court holds that plaintiff was performing his job satisfacto-rily for purposes of establishing the second prong of the *McDonnell–Douglas prima facie* test. Because defendant recruited plaintiff for the position and he had held management-level positions in sales before, the Court will find plaintiff was performing his job satisfactorily.

As to the third prong of the *prima facie* case, there is no question but that plaintiff was terminated and, therefore, suffered adverse employment action.

Finally, there is disagreement between the parties regarding the requisite show-ing necessary to satisfy the fourth prong of the *prima facie* LAD age discrimination case. Plaintiff contends that he is under no obligation to show that he was replaced by someone younger than he was; defen-dant believes plaintiff must do so. The parties are correct that the caselaw on this point does not present a settled picture. Therefore, this Court must predict how the New Jersey Supreme Court would de-cide the issue. In so doing, the Court considers decisions of the Appellate Divi-sion as well as decisions of federal appeals and district courts. *Boyanowski v. Capi-tal Area Intermediate Unit,* 215 F.3d 396, 406 (3d Cir.2000).

 Having undertaken an extensive review of the caselaw, the Court finds that the weight of authority tips decisively in defendant's favor on this point. In fact, plaintiff relies almost exclusively upon a single recent Appellate Division opinion, *Reynolds v. Palmut Co.,* 330 N.J.Super. 162, 748 A.2d 1216 (App.Div.2000), which interpreted a New Jersey Supreme Court opinion, *Bergen Comm. Bank v. Sisler,* 157 N.J. 188, 723 A.2d 944 (1999), to require only a showing that the employer contin-ued to look for people to replace plaintiff after he was terminated, as opposed to a showing that plaintiff was replaced by someone younger. This Court believes that *Reynolds* is an outlier opinion and that the *Reynolds* court misconstrued the standard in *Sisler.* Therefore, this Court will reject that reading and agree with the weight of authority from other New Jersey federal and state cases that require plain-tiff to show that he was replaced by some-one sufficiently younger so as to raise an inference of impermissible age discrimina-tion.

The Court feels confident that the New Jersey Supreme Court's opinion in *Sisler* was not intended to be interpreted as the *Reynolds* court did. In fact, another Ap-pellate Division opinion interpreted *Sisler* consistently with this Court's holding to-day. *See Williams v. Pemberton Town-ship Pub. Schs.,* 323 N.J.Super. 490, 500, 733 A.2d 571 (App.Div.1999) ("[I]n *Bergen Commercial Bank v. Sisler,* 157 N.J. 188, 723 A.2d 944 (1999), the Court recognized that in cases of age discrimination brought under New Jersey law, courts have modi-fied the fourth element to require a show-ing that the plaintiff was replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'") (*quoting Kelly v. Bally's Grand, Inc.,* 285 N.J.Su-per. 422, 429, 667 A.2d 355 (App.Div.1995)).

In *Reynolds,* the Appellate Division rejected the trial court's finding that plaintiff failed to establish a *prima facie* case because he had not shown that defendants replaced him with "a candidate sufficiently younger to permit an inference of age discrimination." *Reynolds,* 330 N.J.Super. at 168, 748 A.2d 1216. Instead, the *Reynolds* court relied on *Sisler,* which it determined required only a showing that the employer sought others to perform the work after the complainant was discharged. In *Reynolds,* the Appellate Division found that *Sisler*'s requirement of a showing of actual replacement was only necessary in reverse discrimination cases, to which New Jersey courts apply a heightened standard.

This Court does not agree with the *Reynolds* court's interpretation of *Sisler.* A careful reading of the New Jersey Supreme Court's opinion in *Sisler* suggests the error of the *Reynolds* court's ways. While the *Reynolds* court is correct that the New Jersey Supreme Court has created a heightened standard of proof for establishing a *prima facie* case in reverse discrimination cases, the heightened showing is as to the first part of the four-part *prima facie* case, not the fourth. The fourth prong remains unchanged in age discrimination cases, whether they be traditional or reverse.

In *Sisler,* the court notes that a reverse discrimination claim should be evaluated under the modified *McDonnell Douglas* standard established in that court's opinion, *Erickson v. Marsh & McLennan Co., Inc.,* 117 N.J. 539, 569 A.2d 793 (1990). In *Erickson,* a reverse sex discrimination case, the court noted that "when a complainant is not a member of the minority, courts have generally modified the *first* prong of the *McDonnell Douglas* standard to require the plaintiff to show that background circumstances suggest that plaintiff has been victimized by that 'unusual employer who discriminates against the majority.'" *Id.* at 551, 569 A.2d 793 (*quoting Livingston v. Roadway Express,* 802 F.2d 1250, 1252 (10th Cir.1986)). Other cases have followed this approach. *See, e.g., Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1252 (6th Cir.1985); *Parker v. Baltimore & O.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981). The "heightened showing" has nothing to do with the fourth prong of the *prima facie* test.

In fact, *Sisler* seems to clearly state that in *all* age discrimination cases, not just in reverse discrimination cases, the fourth prong of the *McDonnell Douglas* standard requires a showing that plaintiff was replaced by a younger employee. Dicta in *Sisler* teaches that, with respect to traditional age discrimination claims, New Jersey requires a showing of replacement by a younger individual. *See Sisler,* 157 N.J. at 212, 723 A.2d 944 ("[U]nder the LAD ... courts have modified the fourth element to require a showing that the plaintiff was replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'") (*citing Kelly,* 285 N.J.Super. at 429, 667 A.2d 355; *Waldron v. SL Indus., Inc.,* 849 F.Supp. 996, 1001 (D.N.J.1994)). And, the holding in *Sisler,* requires the same showing for reverse discrimination claims. *Id.* at 218, 723 A.2d 944 (requiring Sisler to show "that he was replaced with a candidate sufficiently older to permit an inference of age discrimination" in order to satisfy the fourth prong of the *prima facie* case).

Other courts, both state and federal, have similarly required plaintiffs to make a showing of replacement by someone sufficiently younger to raise an inference of age discrimination. In a recent Appellate Division case, *Mamola v. Trucolor Labs,* No. A–6021–98T1 (N.J.Super.Ct.App.Div. Dec. 8, 2000), in fact, the court was squarely presented with the same question as the

*Reynolds* court. At trial, the Law Division judge had instructed the jury that plaintiff had conclusively established the first three prongs of the *prima facie* case and that the only factual question for their determination was whether the employer replaced plaintiff with a younger employee. The jury found for defendant. On appeal, plaintiff contended that the instructions to the jury on the fourth prong of the *prima facie* case were contrary to law and required reversal.

The Appellate Division disagreed, finding that "[i]n a discriminatory discharge case predicated on the employee's age, the fourth prong of the *prima facie* case consists of proof that the discharged employee's functions survived and that a younger person or persons assumed the discharged employee's job functions." *Id.* at 12 (citing *Baker v. The National State Bank*, 312 N.J.Super. 268, 289, 711 A.2d 917 (App. Div.1998); *Geldreich v. Am. Cyanamid Co.*, 299 N.J.Super. 478, 489, 691 A.2d 423 (App.Div.1997)). The Appellate Division in *Baker* affirmed the Law Division Judge's charge to the jury that plaintiffs had satisfied the requirements of the *prima facie* case where they had shown that each plaintiff was discharged and replaced by a younger employee. *Baker*, 312 N.J.Super. at 293–84, 711 A.2d 917. And, in *Geldreich*, the Appellate Division found that plaintiff satisfied the fourth prong by showing that his job functions were assumed by other employees, one six years younger and another ten years younger. *Geldreich*, 299 N.J.Super. at 489–90, 691 A.2d 423.

Federal courts interpreting New Jersey law have likewise adopted the *Mamola* approach rather than the *Reynolds* one. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (requiring a showing that "plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination" in or-

der to satisfy fourth prong of the *prima facie* case); *Pepe v. Rival Co.*, 85 F.Supp.2d 349, 365 (D.N.J.1999) (same); *Greenberg*, 310 N.J.Super. at 201, 708 A.2d 460 (noting that, by showing that "similarly situated but younger [individuals] were rehired and granted tenure," plaintiff satisfied the fourth-prong of the *prima facie* case of age discrimination under the LAD); *see also Kelly*, 285 N.J.Super. at 429, 667 A.2d 355 (noting that "federal courts have articulated a specific test with regard to age discrimination, which is helpful in analyzing plaintiff's complaint," which requires proof that plaintiff was "passed over in favor of a candidate sufficiently younger to permit an inference of age discrimination").

Therefore, the Court holds that in order to satisfy the fourth prong of the *McDonnell Douglas prima facie* case, plaintiff must show that he was replaced by someone sufficiently younger to create an inference of unlawful age discrimination. Plaintiff argues, by way of sur-reply, that he has produced adequate evidence to make that showing. Plaintiff points to defendant's responses to interrogatories wherein defendant indicated that three individuals assumed plaintiff's duties and responsibilities following his termination: Gretchen Lee, Peter Germano and Neil Breithaupt. Defendant's Amended Responses to Plaintiff's Interrogatories, it should be noted, include Michael Stoll in that list as well. Moreover, in deposition testimony, Rich Magid indicated that plaintiff's responsibilities were assumed by Michael Stoll and Neil Breithaupt. Greg Kilrea also testified that Michael Stoll was called upon to assist in the sales management effort of the New Jersey office after plaintiff's discharge. Kilrea Dep. 44:19–45:2. And Sabina Filipovic testified that Michael Stoll had been managing the office since plaintiff's termination with assistance from Neil Breithaupt. Filipovic Dep.

48:12–23. Deposition testimony further seemed to call into question whether Gretchen Lee really assumed plaintiff's responsibilities. A number of witnesses testified that she actually took over operations. *See* Plaintiff's Brief, at 15 (*citing* Filipovic Dep. 84:16–85:2; 87:12–14; N. Breithaupt Dep. 83:17–21).

 Under these facts, it is important to note that plaintiff need not show that he was replaced by someone from the outside in order to make out a *prima facie* case. *See Torre v. Casio, Inc.*, 42 F.3d 825, 831–32 (3d Cir.1994); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990) (*citing Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989)). Therefore, the question for the Court is whether the assumption of plaintiff's duties by two individuals younger than he (Lee and Germano) and two individuals older than he (Breithaupt and Stoll) is adequate to give rise to an inference of unlawful age discrimination.

In *Fischer v. Allied Signal Corp.*, 974 F.Supp. 797 (D.N.J.1997), this Court granted defendant's motion for summary judgment in an age discrimination case where plaintiff applied for five positions, three of which were filled by persons older than plaintiff, finding no inference of age discrimination. As in *Fischer*, plaintiff here points to no other evidence of unlawful discrimination than his age at the time of his discharge and the fact that he was replaced by individuals both younger and older than he was. Here, as in *Fischer*, this Court finds no inference of discrimination on such a meager showing.

Based on the foregoing, the Court holds that plaintiff has failed to make out a *prima facie* case of employment discrimination. Plaintiff has failed to establish that he was replaced by someone sufficiently younger to give rise to an inference of age discrimination.

### ii. Legitimate, Non–Discriminatory Reason

Having found that plaintiff failed to make out a *prima facie* case of unlawful employment discrimination, the Court need proceed no further in its *McDonnell Douglas* analysis. However, in the interests of thoroughness, the Court will advance to the next step to demonstrate that, even if plaintiff had made out a *prima facie* case of age discrimination, defendant had two legitimate, non-discriminatory reasons for terminating plaintiff.

At this second stage of the *McDonnell Douglas* analysis, therefore, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's discharge. *Lawrence v. Nat'l Westminster Bank of New Jersey*, 98 F.3d 61, 66 (3d Cir.1996). The burden on defendant at this stage is merely a burden of production. The ultimate burden of proof remains on plaintiff to establish unlawful discrimination. *Bergen Comm. Bank v. Sisler*, 157 N.J. 188, 211, 723 A.2d 944 (1999); *see also Mogull v. CB Comm. Real Estate*, 162 N.J. 449, 744 A.2d 1186 (2000). To satisfy its burden of production, " 'the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection' which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action." *Stewart v. Rutgers*, 120 F.3d at 432 (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Dixon v. Rutgers*, 110 N.J. at 442–43, 541 A.2d 1046.

■ The Court finds that defendant has articulated legitimate, non-discriminatory reasons for plaintiff's discharge. Defendant points to two reasons, both of which satisfy its burden of production: (1) plaintiff's high salary was unjustified when he was not making any sales personally and was not sufficiently driving up sales overall; and (2) plaintiff was responsible for the low morale in the New Jersey office and its strained relations with corporate headquarters. Each of these asserted reasons is supported by evidence in the form of deposition testimony. *See* Magid Dep. 41:19–22; 45:5–10; 46:7–13; 48:18–49:3; Kilrea Dep. 43:17–48:24; Filipovic Dep. 47:18–48:5. There is even evidence that plaintiff was aware that defendant felt plaintiff needed to make sales. Magid testified that he and plaintiff discussed plaintiff's selling on numerous occasions, but that plaintiff refused to consider such a proposition. Therefore, both proffered reasons satisfy defendants' burden of production.

### iii. Pretext

Once a defendant has articulated one or more legitimate, non-discriminatory reasons for its employment decision, the presumption of discrimination created by establishment of the *prima facie* case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual—that is, that they are false and that the real reason for the employment decision was discriminatory. *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995).

At the summary judgment stage, plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action. *Fuentes v. Perskie,* 32 F.3d 759, 764–65 (3d Cir.1994); *see*

*also Kelly,* 285 N.J.Super. at 431, 667 A.2d 355 (holding that plaintiff "need only point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons"). If a plaintiff who has established a *prima facie* case can raise enough suspicions that the employer's proffered reasons for termination were pretextual, the motion for summary judgment should be denied. *Bray v. Marriott Hotels,* 110 F.3d 986, 990–91 (3d Cir.1997). To discredit the employer's proffered reason, however, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Fuentes,* 32 F.3d at 765. Plaintiff must present evidence sufficient to establish that defendant's proffered reason for terminating him is "weak, implausible, contradictory or incoherent," or that an illegitimate factor was more likely than not a motivating or determinative cause. *Id.; see also Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1263 (D.N.J.1994), *aff'd,* 67 F.3d 291 (3d Cir.1995).

Plaintiff has failed to meet that burden. Plaintiff attempts to undermine the credibility of defendant's proffered reasons by pointing to the fact that some witnesses testified as to only the first of the proffered reasons, while others spoke only of the second. Plaintiff contends that this evidences inconsistency or contradiction. The Court disagrees, finding that the differing testimony does not constitute evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" so glaring that a finder-of-fact could find the proffered reasons incredible. To the contrary, both of defendant's asserted bases for terminating plaintiff go to the successful and efficient operation of the New Jersey office, so

there is no inherent contradiction or inconsistency in the assertion of both as bases for plaintiff's discharge.

■ Plaintiff also argues that he was qualified to remain with defendant and that his performance was satisfactory. In support of that contention, plaintiff notes that the New Jersey office had sales and profits in excess of those projected by the company for one month during plaintiff's tenure as Sales Manager. However, Kilrea, the company's CFO, questioned the accuracy of those numbers, fearing they might have been skewed by certain variables. Kilrea Dep. 56:5–57:17. Moreover, a plaintiff's disagreement with a defendant's evaluation of his performance, or the plaintiff's own perception of his performance, does not demonstrate pretext under the *McDonnell Douglas* framework. *See Billet v. CIGNA Corp.*, 940 F.2d 812, 825–27 (3d Cir.1991) (observing that plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker"); *Fowle v. C & C Cola*, 868 F.2d 59 (3d Cir.1989) (indicating that plaintiff's challenge to employer's conclusion that plaintiff lacked requisite leadership skills for position was immaterial to whether employer's stated justification for adverse employment action was pretext); *Chou v. Rutgers*, 283 N.J.Super. 524, 545–46, 662 A.2d 986 (App.Div.1995) (superior's evaluation of plaintiff, even if not completely fair or impartial, does not support conclusion that employer's decision to deny promotion application was based on national origin, ancestry or race), *certif. denied*, 145 N.J. 374, 678 A.2d 714 (1996). Consequently, plaintiff's conclusory allegations that he was qualified do not demonstrate that defendant's explanation that he was legitimately terminated was mere pretext for discrimination. Defendant contends that plaintiff's performance was not satisfactory and that it felt plaintiff was overpaid as a Sales Manager, who was not making any sales. There is substantial

evidence in the record to support defendant's proffered reasons and no evidence to suggest that they are pretext. Employees in the New Jersey office were complaining about plaintiff, specifically about his management skills and leadership ability. There was also testimony that Magid met with plaintiff about the need for plaintiff to begin making sales.

Plaintiff also asserts that he was not responsible for the low morale in the New Jersey office, but rather that this was the fault of Anne Nepo. As noted above, the question under both prongs of *Fuentes* is not whether the employer's decision was wrong or mistaken, but rather whether the proffered reason was not the real reason motivating the employer's action. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir.1997). Therefore, the wisdom of defendant's choice to terminate plaintiff rather than Nepo is not relevant.

Plaintiff has pointed to no evidence to call into question the credibility of defendant's proffered reasons. The record here is barren of any evidence of ageism on the part of defendant, beyond whatever inference is to be drawn from the coincidence that plaintiff was forty-nine and fired. Once the employer has presented a legitimate reason for discharging an employee, the law requires that plaintiff come forward with more than mere inferences. Plaintiff has failed to controvert defendant's evidence that defendant was not satisfied with plaintiff's performance and that defendant blamed plaintiff for the general unhappiness of the staff in the New Jersey office. *See Casseus v. Elizabeth Gen. Medical Ctr.*, 287 N.J.Super. 396, 406–07, 671 A.2d 176 (App.Div.1996).

Therefore, plaintiff here can neither make out a *prima facie* case, nor establish that defendant's legitimate, non-discriminatory reasons were pretextual. Plaintiff's

LAD claim cannot survive summary judgment.

### 4. Fraud

■ The third count of plaintiff's complaint alleges fraud. In order to make out a claim of fraud in New Jersey, a plaintiff must establish that defendant made a material misrepresentation of present or past fact, with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. *Jewish Ctr. of Sussex Co. v. Whale,* 86 N.J. 619, 622, 432 A.2d 521, 524 (1981).

■ According to plaintiff, defendant's statement to plaintiff that he would be the Sales Manager for New Jersey was made falsely, with knowledge of its falsity and with the intention that plaintiff would rely on that representation. Plaintiff further contends that he relied on that representation in deciding to accept defendant's offer and that he would not have accepted defendant's offer if he had known that Neil Breithaupt had also been hired as Sales Manager and had been given a written contract.[4] The parties both discuss affirmative misrepresentations as well as non-disclosures or concealments. The standard for making out a claim for each is different. *See Lightning Lube, Inc. v.*

*Witco Corp.,* 4 F.3d 1153, 1182–85 (3d Cir. 1993). However, the Court is not persuaded that plaintiff has alleged any actionable non-disclosures. The Complaint points only to affirmative statements made by defendant to plaintiff during the negotiation of plaintiff's employment agreement. Therefore, the Court evaluates plaintiff's fraud claim solely under the standard from *Jewish Ctr. of Sussex Co.* laid out above.

Defendant made no material misrepresentation to plaintiff regarding his status as Sales Manager. He was hired as Sales Manager, as promised, and his duties were fitting of his title. The fact that Neil Breithaupt was also a sales manager does not make defendant's statement to plaintiff false, nor does it change the fact that plaintiff was in fact Sales Manager. Plaintiff does not allege, and cannot because there is no evidence to support such a contention, that his discharge was due to the fact that Neil Breithaupt was hired as a Sales Manager. To the contrary, plaintiff has made clear that Neil Breithaupt never assumed any duties that plaintiff believed were properly his. Swider II 189:22–190:1. Therefore, the statement was not false, and even if it were, it was certainly not material. Under New Jersey law, a fact is material if "a reasonable [person] would attach importance to its

---

4. The Court addresses only those alleged misrepresentations contained in plaintiff's Complaint. In his opposition papers, plaintiff includes a number of other statements made by defendant to plaintiff in the course of negotiations that plaintiff contends were fraudulently made, including defendant's alleged promise that it would not consider the comments of Anne Nepo in deciding whether to hire plaintiff and its promise to plaintiff that he would not have to make sales if he accepted employment as a Sales Manager. Because fraud must be pled with particularity and because this case is already mature in the sense that discovery has been made and countless depositions taken, the Court will limit its consideration of plaintiff's fraud claim to those allega-

tions pled with sufficient particularity. As such, it will not address the merits of the claims of misrepresentation contained in plaintiff's opposition papers. However, it is worth noting that plaintiff could not base a claim of fraud on a statement regarding a future event, such as whether plaintiff would have to make sales if he accepted employment as Sales Manager with defendant. *See Mardini v. Viking Freight, Inc.,* 92 F.Supp.2d 378, 385 (D.N.J.1999) (dismissing a fraud claim based on representations that plaintiff would be considered on equal footing with male employees because such a claim "involves a future event, and a claim of fraud cannot be based on such a representation").

existence or nonexistence in determining his choice of action in the transaction in question." *Strawn v. Canuso,* 140 N.J. 43, 657 A.2d 420 (1995) (*quoting* Restatement (Second) of Torts § 538(2) (1977)). Because neither plaintiff's title nor his job description was affected by the fact that Neil Breithaupt shared the same title, this information was not material to his employment decision.

■ As to defendant's statement that management-level employees did not receive written employment contracts, the Court is not persuaded that, merely because Neil Breithaupt did have one, defendant's statement was a misrepresentation. Neil Breithaupt was the owner of a business bought out by defendant. In such circumstances, it is not unusual to enter into a written employment or consulting agreement with the seller. This assures the purchaser continuity of leadership and the benefits of experience. It may also be a necessary bargaining chip to convince the seller to be bought out. The written employment agreement with Breithaupt, therefore, might have been an unusual measure taken in the context of Breithaupt's company.

However, assuming that the statement was in fact a misrepresentation given that Neil Breithaupt had a written contract for employment as a sales manager, the statement could then also be deemed material, in that whether or not one has a written contract certainly influences one's decision whether or not to take a job. Defendant obviously knowingly made this statement, having given Neil Breithaupt, another New Jersey Sales Manager, a written contract only a matter of months before. And, it seems irrefutable that defendants intended to induce plaintiff's reliance on this misrepresentation, which reliance resulted. The misrepresentation was not, however, one on which plaintiff relied to his detriment. If plaintiff had been in-

formed that Breithaupt had a written contract, he might have insisted on one for himself. However, plaintiff has not pointed to anything in the record to suggest that that written contract would have changed his status as an at-will employee. Therefore, plaintiff would not have gained anything by having a written contract. Alternatively, perhaps plaintiff would have decided that defendant's refusal to give him a written agreement, while another manager had one, indicated that he was not accorded the same respect. Perhaps, then, plaintiff would have sought work elsewhere. There is no evidence, however, to suggest that he would have found a job with a written contract and job security. Therefore, plaintiff did not detrimentally rely on defendant's misrepresentation regarding written contracts for management-level employees.

Therefore, plaintiff's claim will be dismissed.

### CONCLUSION

Based on the foregoing, the Court will grant defendant's motion for summary judgment as to all counts of plaintiff's Complaint. Plaintiff's Complaint will be dismissed in its entirety, with prejudice.